UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RIGOBERTO DE LOS SANTOS,<br><br>Defendant. | CRIMINAL No. 24-278 (CVR) |

### REPORT AND RECOMMENDATION

On August 22, 2024, a grand jury sitting in the District of Puerto Rico returned a four-count Indictment charging Rigoberto de los Santos ("Defendant") with: Count One for conspiracy to possess with intent to distribute cocaine aboard a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. Secs. 70503(a)(1) & 70506(b) and 21 U.S.C. Sec. 960 (b)(1)(B); Count Two for possession with intent to distribute cocaine aboard a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. Secs. 70503(a)(1) and 21 U.S.C. Sec. 960 (b)(1)(B); Count Three for bringing aliens to the United States at a place other than a designated port of entry, in violation of 8 U.S.C. Secs. 1324(a)(1)(A)(i), (v) and (B)(i); and Count Four for false statement or representation made to a Department or Agency of the United States, in violation of 18 U.S.C. Sec. 1001(a)(2). ECF No. 62.

Before the Court is a motion to dismiss the indictment filed by Defendant and the Government's response in opposition.[1] ECF Nos. 75, 76. The motion to dismiss the indictment has

---

[1] The Defendant's motion, which was filed after a grand jury returned an indictment, moves to dismiss the "complaint" (ECF No. 75 at 1, ¶ 3), but then in the prayer for relief requests the dismissal of "all counts in the indictment." ECF No. 75 at 23. For purposes of this report, Defendant's motion is deemed to be seeking dismissal of the indictment.

been referred to the undersigned for a report and recommendation.[2] ECF No. 77. For the reasons that follow, it is recommended that Defendant's request to dismiss the indictment (ECF No. 75) be DENIED.

I. **BACKGROUND**

United States Coast Guard ("USCG") Special Agent Ferdinand Acosta prepared an affidavit in support of the criminal complaint. ECF No. 1-1. Although Defendant contests some of the assertions in the affidavit (e.g., ECF No. 75 at 3, ¶ 8), the Court cannot weigh the evidence.[3] Hence, the following summary relies on the Government's version of the facts for the limited purpose of providing context to Defendant's arguments.

On or about August 5, 2024, U.S. Customs and Border Protection ("CBP") Maritime Patrol Aircraft ("MPA") spotted a go-fast vessel 70 nautical miles Northeast of Aguadilla, Puerto Rico. *Id*. at 3-4, ¶ 13. The vessel displayed no indicia of nationality. *Id*. at 4, ¶ 15. CBP notified USCG of the go-fast vessel and a USCG MPA arrived on the scene, relieving the CBP MPA. *Id*. at 4, ¶ 14. The USCG Boarding Team observed nine persons on board. *Id*. at 5, ¶¶ 13; 21. All occupants of the vessel claimed Dominican nationality for themselves and Dominican nationality for the vessel. *Id*. at 5, ¶ 21. No one claimed to be the master of the vessel. *Id*.

Immediately after arriving on the scene, the USCG Boarding Team witnessed persons on board the vessel throwing four bales overboard into the ocean, a fact which is disputed by the Defendant. *Id*. at 4, ¶ 17. The USCG spotted and retrieved the four jettisoned bales, weighing 79

---

[2] A motion to suppress statements given by Defendant was also included in Defendant's motion to dismiss. ECF No. 75. However, the motion to suppress was denied by the Court on February 20, 2025. ECF No. 80.
[3] Defendant contends that no agent reported that 4 bales were jettisoned overboard and "to the contrary, the report of the incident by the Coast Guard plainly admits that it did not observe the jettisoning of the bales." ECF No. 75 at 3, ¶ 8. However, an omission is not the same as an affirmative statement that no jettisoning was observed. Officer Taylor did not specifically state that he observed the jettisoning, only that another officer spotted the four bundles floating in the water. ECF No. 76-2 at 1. Further, Officer Taylor stated that the vessel was detected with packages and multiple fuel jugs onboard. *Id*. Further, the crew's statement specifically mentions that the USCG "recovered several packages jettisoned from the" vessel. ECF No. 76-1 at 1.

kilograms at sea. *Id*. at 5, ¶¶ 17, 23. The bales were later field tested, and the results came back positive for cocaine. *Id*. at 5, ¶ 23.

On January 15, 2025, Defendant moved to dismiss the indictment and suppress Defendant's post-arrest statement. ECF No. 75. The Government responded. ECF No. 76. The Government attached a U.S. State Department Certificate denying the vessel's registry in the Dominic Republic. ECF No. 76-3. The certification explained that the vessel was located by law enforcement in approximate position 19-36 N, 067-26 W, seaward of any State's territorial sea; that law enforcement suspected the vessel of illicit drug trafficking; that the vessel displayed no indicia of nationality, but that all persons on board made a verbal claim of Dominican Republic nationality for the vessel; and that the Dominican Republic, when contacted, denied registry of the vessel. *Id*. at ¶¶ 4-6. The certification concluded that, "accordingly, the vessel is subject to the jurisdiction of the United States, pursuant to 46 U.S.C. § 70502(c)(1)." *Id*. at ¶ 8.

## II. APPLICABLE LEGAL STANDARD

### A. Motion to Dismiss an Indictment

Federal Rule of Criminal Procedure 12 provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue." FED. R. CRIM. P. 12(b)(1). "When a federal court uses its supervisory power to dismiss an indictment it directly encroaches upon the fundamental role of the grand jury. That power is appropriately reserved, therefore, for extremely limited circumstances." *Whitehouse v. United States District Court*, 53 F.3d 1349, 1360 (1st Cir. 1995).

A defendant may move to dismiss an indictment for defects in the indictment, including lack of specificity and failure to state an offense. FED. R. CRIM. P. 12(b)(3)(B). Defendants may not challenge the government's evidence, only the facial validity of the indictment. *United States v. Guerrier*, 669 F.3d 1, 3-4 (1st Cir. 2011) (citing *United States v. Eirby*, 262 F.3d 31, 37,38 (1st

Cir. 2001)). An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). "What counts in [determining the sufficiency of the indictment] are the charging paper's *allegations*, which we must assume are true." *United States v. Guerrier*, 669 F.3d 1, 3-4 (1st Cir. 2011) (emphasis in original). Thus, a court must not determine whether the government has presented enough evidence to support the charge, but must determine "solely whether the allegations in the indictment are sufficient to apprise the defendant of the charged offense." *United States v. Chalwell*, 2023 WL 6346107, at *2 (D.P.R. Sept. 29, 2023) (citing *U.S. v. Savarese,* 686 F.3d 1, 7 (1st Cir. 2012). *See also U.S. v. Ngige,* 780 F.3d 497, 502 (1st Cir. 2015); *U.S. v. Guerrier*, 669 F.3d 1 (1st Cir. 2011); *U.S. v. Stepanets,* 879 F.3d 367, 372 (1st Cir. 2018).

### B. The Maritime Drug Law Enforcement Act

Defendant's motion to dismiss pertains, in part, to the Maritime Drug Law Enforcement Act ("MDLEA"), 46 U.S.C. §§ 70502(c)(1), *et seq.* Congress enacted the MDLEA in 1986 to diminish the operations of international drug trafficking organizations. It provides in pertinent part:

> an individual [on board a vessel subject to the jurisdiction of the United States] may not knowingly or intentionally ... manufacture or distribute, or possess with intent to manufacture or distribute, a controlled substance.

46 U.S.C. §§ 70503(a)(1). "Courts' reticence regarding pretrial motions to dismiss indictments extends to cases where defendants contend federal jurisdiction is lacking." *United States v. Puello-Morla,* 2023 WL 7185323 *2 (D.P.R. Nov. 1, 2023) (citing *United States v. Guerrier*, 669 F.3d 1, 4 (1st Cir. 2011)). However, in the case of the MDLEA, the government has the burden of establishing United States jurisdiction over a defendant by a preponderance of the evidence. *United States v. Mitchell-Hunter*, 663 F.3d 45, 50, 51 n.8 (1st Cir. 2011); *United States v. Matos-Luchi*, 627 F.3d 1, 5 (1st Cir. 2010). Moreover, "jurisdictional issues arising under the [MDLEA] are preliminary questions of law to be determined solely by the trial judge," and do not constitute an

4

element of the offense. 46 U.S.C. § 70504; *see United States v. Gil-Martínez*, 980 F. Supp. 2d 165, 168 (D.P.R. 2013). Vessels without nationality are subject to the MDLEA. Stateless vessels include, but are not limited to:

> A) **a vessel abroad which the master or individual in charge makes a claim of registry that is denied by the nation whose registry is claimed** (hereinafter, "subsection (A)");
>
> (B) a vessel abroad which the master or individual in charge fails, on request of an officer of the United States authorized to enforce applicable provisions of United States law, to make a claim of nationality or registry for that vessel;
>
> (C) a vessel abroad which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality (hereinafter, "subsection (C)")

46 U.S.C. §§ 70502(d)(1)(A)-(C) (emphasis added). A vessel may be deemed stateless "even if [it] does not fall within one of the specifically enumerated categories." *Matos-Luchi*, 627 F.3d at 15. To facilitate expeditious consent and waiver, the MDLEA provides that the flag state may provide registry information "by radio, telephone, or similar oral or electronic means." 46 U.S.C. § 70502(d)(2).[4]

### III.    ANALYSIS

Defendant advances two distinct arguments in support of his motion to dismiss. First, Defendant argues that Congress' enactment of the MDLEA violates Article I, Section 8, Clause 10 of the United States Constitution (the "Define and Punish Clause"). U.S. CONST. ART. I, § 8 CL. 10. Second, Defendant argues that the deportation of six of the occupants of the vessel violates his Sixth Amendment right by depriving him of testimony that was both material and favorable to his

---

[4] Every vessel is required to "sail under the flag of one State only and, save in exceptional cases ... shall be subject to its exclusive jurisdiction on the high seas." Convention on the High Seas, art. 6, Apr. 29, 1958, 13 U.S.T. 2312, 450 U.N.T.S. 82.

defense. U.S. CONST. AM. VI. For the following reasons, Defendant's motion to dismiss should be DENIED on both grounds.

### A. The Constitutionality of MDLEA

Defendant was charged in Count One and Count Two with violations of the MDLEA for conspiracy to possess with intent to distribute cocaine aboard a vessel subject to the jurisdiction of the United States of America and possession with intent to distribute cocaine on board a vessel subject to the jurisdiction of the United States of America. 46 U.S.C. §§70503(a)(1), 70506(b) and 21 U.S.C. §960(b)(1)(B). In moving to dismiss the indictment, Defendant makes a two-step argument. First, he contends that Congress's authority to criminalize and punish conduct on the high seas under Article I, Section 8, Clause 10 of the United States Constitution must be constrained by the limitations of international law on a nation's power to criminally prosecute conduct on the high seas. ECF No. 75 at ¶ 70. Second, he argues that the United States exceeded those limitations of international law by prosecuting him in this case. *Id*. at ¶ 71. The MDLEA prohibits defendants from challenging their charges on the basis of international law. 46 U.S.C. § 70505. However, at the heart of Defendant's arguments is a constitutional challenge to Congress's power under the Define and Punish Clause, *i.e.*, Defendant is not arguing that international law itself constrains Congress's authority.[5] U.S. CONST. ART. I, § 8 CL. 10 (granting grants Congress the power "[t]o define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations"). *See also United States v. Díaz-Jaramillo*, 2022 WL 17404925, at *3

---

[5] A person charged under the MDLEA "does not have standing to raise a claim of failure to comply with international law as a basis for a defense." 46 U.S.C. § 70505. Further, "only ... a foreign nation" may raise such a claim and that "[a] failure to comply with international law does not divest a court of jurisdiction and is not a defense to a proceeding under this chapter." *Id.* However, this "bar does not apply here precisely because [D]efendant[ ] [is] not arguing that international law itself constrains Congress's authority." *United States v. Dávila-Reyes*, 84 F.4th 400, 408 fn. 35 (1st Cir. 2023).

6

(D.P.R. 2022) (noting that "the core of Defendant's argument is that ... it violates the United States Constitution."). For the following reasons, Defendant's arguments are without merit.

The First Circuit held in *United States v. Dávila-Reyes*, 23 F.4th 153 (1st Cir. 2022) that Congress's authority to define and punish felonies committed on the high seas is constrained by international law. *United States v. Escalona-Reid*, 2022 WL 17541746 at *1 (D.P.R. Dec. 8, 2022) (citring *United States v. Dávila-Reyes*, 23 F.4th 153 (1st Cir. 2022) (citing reh'g *en banc* granted, opinion withdrawn).[6] International law permits the United States to assert such regulatory jurisdiction when the foreign national is aboard a vessel on the high seas that is stateless under international law. *United States v. Aybar-Ulloa*, 987 F.3d 1 (1st Cir. 2021). Because "the stateless vessel concept in the MDLEA and in international law is designed *prudentially*," a *prima facie* case of nationality is not enough. *Matos-Luchi*, 627 F.3d at 6 (emphasis in original) (noting that 46 U.S.C. § 70502(d)(1)(B) is consistent with international law allowing a vessel to be deemed stateless if the master refuses to claim a nationality). Thus, a vessel cannot be deemed stateless under international law merely because, a foreign nation whose nationality the vessel's master claims for the vessel "fail[s] to supply an 'affirmative and unequivocal' confirmation of nationality." § 70502(d)(1)(C). Instead, there must be some way for law enforcement officials to be able to verify a vessel's nationality, and that requires actual proof. *See id.*

Defendant argues that the vessel in this case does not conform to the international customary definition of statelessness or piracy, and thus, "applying the MDLEA to the [D]efendant is not within the offenses that Congress could constitutionally enact pursuant to the [Define and

---

[6] The First Circuit "withdrew [its] prior panel opinion and granted panel rehearing after the en banc court issued its opinion in *Aybar-Ulloa*." *Dávila-Reyes*, 23 F.4th at 195. The prior *Dávila-Reyes* decision was withdrawn on July 5, 2022 to conduct an *en banc* review of § 70502(d)(1)(C) specifically. *United States v. Reyes-Valdivia*, 38 F.4th 288 (1st Cir. 2022). Accordingly, the prior *Dávila-Reyes* opinion is no longer binding on this Court. *See United States v. Escalona-Reid*, 2022 WL 17541746 at *1 (D.P.R. Dec. 8, 2022) ("So although we write in the shadow of *Dávila-Reyes*, it has no weight here.").

7

Punish] Clause." ECF No. 75 at ¶ 6. However, according to a Certification from the U.S. Department of State, which Defendant has not disputed, all persons on board the vessel in question made a verbal claim of Dominican Republic nationality for the vessel. ECF No. 76-3 at 1. Yet, the Dominican Republic denied the vessel's registry. *Id*. Such a certification is in and of itself conclusive proof as to the response of a country that has been contacted for purposes of determining that a vessel is "without nationality" under § 70502(d)(1)(C). This certification is enough to prove that the vessel is stateless. *See United States v. Sánchez-Matos*, 686 F.Supp.3d 47, 53 (D.P.R. 2023) (finding that a post-indictment Department of State certification is incontrovertible proof that a defendant's vessel is stateless). *See also United States v. Romero*, 32 F.3d 641, 648 (1st Cir. 1994) ("To satisfy the jurisdictional requirement under [the predecessor to subsection (A)], the government presented a 'certification of denial' from the State Department as proof that the defendants' claim of registry was denied by Colombia."); *United States v. Rosero*, 42 F.3d 166, 174 (3d Cir. 1994) ("[The] prosecution can establish that a vessel is stateless by showing that the master or person in charge made a claim of nationality that was denied by the flag nation whose registry was claimed."); *United States v. Mosquera*, 192 F. Supp. 2d 1334, 1349 (M.D. Fla. 2002) ("[The] Guatemalan authorities denied registry of the Defendant's vessel. Thus, the vessel was stateless for purposes of [the MDLEA]."). Furthermore, "any further question about [the Department of State certification] is a question of international law that can be raised only by the foreign nation." *United States v. Cardales-Luna*, 632 F.3d 731, 737 (1st Cir. 2011) (citation and internal quotation omitted). Because the post-indictment Department of State certification is conclusive proof of statelessness, the Defendant's arguments that that the vessel was not stateless for purposes of international law ring hollow.

Defendant also challenges Congress's authority to enact the MDLEA, attacking the constitutionality of the statute. Defendant acknowledges that "[t]he case law interpreting the

8

authority of the U.S. Congress to enact the MDLEA assumes that jurisdiction befalls to the United States by allegiance of the crew to the United States or the vessel's owner, modern international law statelessness, or consent by the flag nation of the vessel." ECF No. 75 at ¶ 70 (citing *Aybar-Ulloa*, 987 F.3d at 2-3). However, Defendant argues that "intervening rulings from the Supreme Court require this Court to dig back into the historical archive" and find the "meaning of the phrase 'Felonies of the High Seas' during the 18th century," using the historical approach employed by the Supreme Court in *N.Y.S. Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 142 S. Ct. 211 (2022) and *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215, 142 S. Ct. 2228 (2022). *Id*. at ¶¶ 73-74. Defendant contends that, if that approach is followed, it is evident that the felonies of the high seas, as understood during the period of the founding and at common law, do not include drug trafficking. *Id*. at ¶¶ 75-80.

However, the historical analysis undertaken in *Bruen* and *Dobbs* has no implications in the case at hand. Defendant argues that there is no statement in either case that "the fundamental interpretive approach should not be applied to the interpretation of other parts of the Constitution." *Id*. at ¶ 74. The invitation to follow this approach in the particular circumstances of the case at hand, however, should be declined. The decision in *Bruen* concerned the Second Amendment of the United States Constitution, holding that:

> [When] the **Second Amendment's** plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.

142 S. Ct. at 2126 (emphasis added). "Relying on the founding father's understanding of the Second Amendment is not a license for this Court to invalidate the MDLEA." *United States v. Gutiérrez-Moreno*, 2022 WL 6697650 *2 (D.P.R. Oct. 11, 2022). The founding father's understanding of the

9

Fourteenth Amendment's Due Process Clause is equally inapplicable to assessing the constitutionality of the MDLEA. The Supreme Court in *Dobbs* explained that "historical inquiries are essential whenever the Court is asked to recognize a new component of the 'liberty' interest protected by the Due Process Clause." 597 U.S. at 216. Therefore, Defendant's demand that the constitutionality of the MDLEA be examined through the prism of the history of the United States of America is inapposite.

Moreover, there is precedent, consistent with the weight of authority, that the MDLEA is a constitutional exercise of congressional authority pursuant to the Define and Punish Clause. *See United States v. Díaz-Doncel*, 990 F. Supp. 2d 163, 164 (D.P.R. 2014) (Besosa, J.) (citing *United States v. Nueci-Peña*, 711 F.3d 191, 198 (1st Cir. 2013). Further, motions to dismiss MDLEA actions on this same basis have been routinely denied. *See e.g. United States v. Salazar-Realpe*, 2015 WL 3820757 *3 (D.P.R. June 18, 2015) (holding that the "MDLEA is constitutionally valid under the Define and Punish Clause") (Delgado-Hernández, J.); *United States v. Ramírez*, 2019 WL 5581700 *2 (D.P.R. Oct. 28, 2019) (holding that the "MDLEA does not exceed Congress' power under the Define and Punish Clause") (Cerezo, J.). While the First Circuit has not specifically answered the question, other circuit courts have weighed in on MDLEA's constitutionality. The Third, Fifth, Ninth, Eleventh, and D.C. Circuits have found a constitutional basis for the MDLEA. *See United States v. Ballestas*, 795 F.3d 138, 146–47 (authority under Define and Punish Clause); *Untied States v. Campbell*, 743 F.3d 802, 810 (11th Cir. 2014) (same); *United States v. Ledesma-Cuesta*, 347 F.3d 527, 531–32 (3d Cir. 2003) ("Congress had authority to enact" the MDLEA's predecessor statute "pursuant to its constitutional power" under the Define and Punish Clause); *United States v. Moreno-Morillo*, 334 F.3d 819, 824 (9th Cir. 2003) ("Congress…was acting within its constitutionally conferred authority when it passed the MDLEA," specifically, "Article I, Section 8, Clause 10"); *United*

*States v. Suerte*, 291 F.3d 366, 376–77 (5th Cir. 2002) (the power "to define and punish Piracies and Felonies committed on the high seas, and Offenses against the Law of Nations is the only specific grant of power to be found in the Constitution for the punishment of offenses outside the territorial limits of the United States") (internal quotations omitted).

In sum, it is recommended that the Court find that the MDLEA is a proper exercise of congressional authority. *See also United States v. Nueci-Peña*, 711 F.3d 191 (1st Cir. 2013); *U.S. v. Matos–Luchi,* 627 F.3d 1 (1st Cir. 2010). Furthermore, "[e]very legislative act is to be presumed to be a constitutional exercise of legislative power until the contrary is clearly established." *Close v. Glenwood Cemetery*, 107, U.S. 466, 475 (1883). Here, Defendant fails to meet this exceptionally high standard. Consequently, Defendant's MDLEA arguments do not hold water.

### B. Exculpatory Evidence

Next, Defendant argues that the Government violated his Sixth Amendment right by deporting six out of the eight passengers, depriving him of their testimony, which he argues is both material and favorable to his defense. ECF No. 75 at ¶¶ 36-67. Specifically, Defendant argues that occupants one, two, three, four, six, and eight provided material information that was favorable to his defense.[7] *Id*. at ¶¶ 40-45. For the following reasons, none of these occupants' statements constitute exculpatory evidence.[8]

---

[7] Defendant contends that they never received the statements from Occupant 7. ECF No. 75 at ¶ 35. The Court ordered the Government to clarify the status of Occupant 7's statements. ECF No. 82. The Government informed that Court that all persons onboard the vessel were interviewed and provided statements, including Occupant 7. ECF No. 83. Occupant 7's statements were provided to the Court on March 6, 2025. ECF No. 86. Among other matters, Occupant 7 stated to law enforcement agents that he was not aware of narcotics on the vessel. Not being aware of the presence of narcotics, however, is not the same as stating that there were no narcotics on the vessel. A vessel may be carrying narcotics without the knowledge of some of its passengers. Therefore, Occupant 7's statements are not exculpatory.

[8] Occupant 5 is not discussed at length by the parties. Defendant's motion to dismiss indicates that Occupant 5 states that he was a fisherman in the Dominican Republic and that he was drunk when he boarded the vessel. ECF No. 75 at 9, ¶ 33. These statements are neither material nor exculpatory.

To obtain a dismissal of the indictment based on the Government's deportation of these witnesses, the Defendant must show: "(1) the government acted in bad faith by allowing a witness with potentially exculpatory information to depart; and (2) the voluntary departure of the absent witness prejudiced him by eliminating testimonial evidence that would be both material and favorable to the defense." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 858–59 (1982). This test balances a defendant's right to present his version of events to the jury with the government's interest in enforcing the immigration laws by promptly deporting aliens who "possess no material evidence relevant to a criminal trial." *Id*. at 864–66.

The Court need not decide in this case whether Defendant met his burden of showing bad faith because he failed to make a showing at step two, *i.e.*, that prejudice resulted to his case. To prevail under the prejudice prong, the Defendant must at least make "a plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses." *Valenzuela-Bernal*, 458 U.S. at 873. Exculpatory evidence includes, but is not limited to, the confession of someone other than the defendant, an alibi, evidence that was related to the credibility of a key witness, or evidence that suggests someone else could have committed the crime. *See e.g. Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972); *Kyles v. Whitley,* 514 U.S. 419 (1995); *United States v. Agurs*, 427 U.S. 97 (1976). In other words, evidence is exculpatory if it relates to the defendant's guilt or impacts his punishment. *Valenzuela-Bernal*, 458 U.S. at 867–68. "'[I]mplicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial.'" *Id.* at 868 (quoting *United States v. Agurs,* 427 U.S. 97, 104 (1976)). In the context of MDLEA prosecutions, courts balance the exculpatory evidence in light of the strength of the inculpatory evidence. *See e.g., United States v. Hernández*, 864 F.3d 1292, 1305 (11th Cir. 2017) (holding that no due process violation occurred in prosecution for cocaine

12

smuggling when the Coast Guard sank the defendants' vessel, which contained potentially useful clothing and equipment); *United States v. Revolorio-Ramo*, 468 F.3d 771 (11th Cir. 2006) (finding that destruction of the vessel did not violate defendants' due process rights, noting that although the fishing equipment aboard the ship was potentially exculpatory, the defendants were able to present alternative evidence and cross-examine the officers).

Regarding Defendant's charges of conspiracy to possess with intent to distribute cocaine and possession and intent to distribute cocaine aboard a vessel subject to the jurisdiction of the United States (Counts One and Two), Defendant argues that occupants provided testimony that would be material and favorable to his defense because the statements show that there were no narcotics on board. However, based on the Defendant's explanation of the occupants' testimony, all of whom were interviewed prior to deportation, no occupant made an explicit statement that there were no narcotics on board.[9] Occupants 1, 4, 7, and 8 indicated that they were not aware of the presence of, or did not see, any narcotics in the vessel. ECF No. 75 at ¶¶ 29, 32, 34, 40, 43, 45; ECF No. 86-1 at 1. Occupant 3 stated that he only observed gas and food inside the vessel. *Id*. at ¶¶ 31, 42. Testimony that occupants were not aware of the presence of, or did not see, any narcotics is not the same as affirmative statements that there were no narcotics on board the vessel. Further, the mere fact that an occupant only saw gas and food on the vessel does not necessarily mean there were no drugs on board. After all, drugs can be concealed. Thus, these statements are not exculpatory.

---

[9] Neither the Government nor Defendant provided the Court with all the reports materializing the statements or accounts of the statements from the occupants. The Court only has access to the report of Defendant's post arrest interview (ECF No. 76-4) and the report memorializing Occupant 7's post arrest statements (ECF No. 86-1). Thus, the Court relies on Defendant's version as to the content of all remaining occupants' statements, as the Government has not challenged or contradicted that version.

Occupant 6 stated that he did not observe any jettisoning, while Occupant 1 stated that the items thrown overboard were gasoline canisters. *Id*. at ¶¶ 27, 40, 44. Occupant 6's testimony that he did not observe any jettisoning does not necessarily imply that nothing was jettisoned. Depending on where a passenger is seated and from where in the boat items are jettisoned, it is possible for items to be thrown overboard without being observed by some passengers. Thus, Occupant 6's statement is not exculpatory. With respect to Occupant 1's statement that the items thrown overboard were gasoline canisters meant to relieve the weight of the boat, it is not clear from Defendant's motion whether Occupant 1 meant that canisters of gasoline were thrown overboard periodically (or gradually) as the trip progressed, or at the moment of the intervention by law enforcement agents. Hence, Defendant's motion with respect to Occupant 1 is not precise enough to deem it material or exculpatory.[10]

Moreover, it is highly unlikely that the occupants' statements "could have affected the judgment of the trier of fact" on this count given the rest of the evidence in this case. *United States v. Bresil*, 767 F.3d 124, 130 (1st Cir. 2014) (quoting *Valenzuela-Bernal*, 458 U.S. at 873-74). The Court in *Bresil* found it "highly unlikely that any reasonable jury would have believed any claim that the boat was headed to St. Maarten based merely on self-serving assertions to that effect from other passengers" given:

> …the direction in which the boat was traveling (north-east toward Puerto Rico rather than straight east toward St. Maarten), the location in which it was intercepted (23 nautical miles from Puerto Rico and more than 175 nautical miles from St. Maarten), the limited fuel on board, and the fact that it was traveling at night without lights…

767 F.3d at 131. Here, Defendant provided the following information to USCG during his interview: Defendant and the other occupants of the vessel rented the boat they were interdicted

---

[10] In the alternative, the Defendant has not shown that the Government acted in bad faith when Occupant 1 was deported.

14

on, as a family, from an unknown male in Dominican Republic, for an unknown amount of money; they launched the boat from a place (the name of which he can't remember) in Samana, Dominican Republic; after launching and while at sea, another boat with an unknown number of individuals, all wearing masks, came along and ordered them to take drugs to Puerto Rico; these men put the bales of narcotics on his boat; and lastly, that Defendant was originally a passenger but later took command of the boat. ECF No. 76-4. It is highly unlikely that any reasonably jury would believe that the occupants were a family and that they were approached at sea and forced to carry drugs into Puerto Rico by unknown individuals, given the rest of the evidence in this case. Specifically, Defendant is the only occupant that made a statement acknowledging that drugs were onboard the vessel or that they were all traveling as a family. ECF No. 76-4 at 1. None of the other occupants mentioned any individuals with masks placing anything, including drugs, onboard the vessel after they had launched from the Dominican Republic. *See generally* ECF No. 75 at ¶¶ 27-34, 40-45; ECF No. 86-1. Moreover, Defendant himself admits that he took command of the boat at one point, Occupant 6 identified Defendant as the person commanding the boat, and Occupant 2 provided statements that Defendant was conducting the vessel at some point as well. ECF No. 75 at 8, ¶¶ 27, 30; ECF No. 76-4 at 1. In sum, the other occupants' statements would not have bolstered Defendant's version of the events in a material way.[11] *Bresil*, 767 F.3d at 130.

Finally, regarding Defendant's charges for bringing aliens into the United States (Count Three), Defendant argues that occupants provided testimony that would be material and favorable to his defense because the statements demonstrate that occupants did not pay Defendant for the

---

[11] If Defendant is correct that the deportation wrongfully deprived him of relevant and material testimony, he could put into evidence the favorable hearsay statements of the other passengers under Federal Rule of Evidence 804(b)(6). "True, the testimony would not have been live for the jury, but it also would not have been subject to cross-examination by the government. Nor would the government have likely been able to offer the conflicting statements." *Bresil*, 767 F.3d at 131. Therefore, the Defendant's Sixth Amendment right was not violated by the deportation of the six vessel occupants.

trip, that Defendant did not arrange the trip, and that other occupants other than Defendant were piloting the vessel.[12] *Id*. at ¶¶ 40-45. Occupant 2 stated that he paid 18,000 Dominican Pesos to a man named Antonio. *Id*. at ¶¶ 30, 41. Occupant 3 stated that he paid $3,000 dollars to an individual that his friend introduced him to. *Id*. at ¶¶ 31, 42. Occupant 4 indicated that his family paid the fee and the trip was arranged by an individual named Ramón. *Id*. at ¶¶ 32, 43. Occupant 4 further asserted that at least four occupants of the vessel took turns operating the motor and the GPS. *Id*. Occupant 6 indicated that he paid 30,000 Dominican pesos for the trip. *Id*. at ¶¶ 27, 44. Occupant 8 indicated that all occupants contributed to fund the trip and that he himself contributed to the trip by bringing gas. *Id*. at ¶¶ 34, 45. However, statements that at various times others were piloting the boat do not necessarily mean that Defendant was not the commander, nor does it refute one occupant's statement that Defendant was, in fact, the commander. *Id*. at ¶ 27. Furthermore, there is no requirement in the charged offense of an actual payment or even an agreement to pay; instead, courts have interpreted "bringing" to require "active conduct on the part of the defendant" where the defendant *accompanies* or arranges to have the alien accompanied. *United States v. Garcia-Paulin*, 627 F.3d 127, 132 (5th Cir. 2010). Defendant himself admits that he took command of the boat at one point, Occupant 6 identified Defendant as the person commanding the boat, and Occupant 2 provided statements that all occupants, including Defendant, took turns in conducting the vessel at some point. ECF No. 75 at 8, ¶¶ 27, 30; ECF No. 76-4 at 1. Section 1324(a)(1)(A)(i) and (v) requires only that a defendant know that the persons being brought in are aliens, and

---

[12] Defendant does not elaborate on his reasons for the dismissal of Count Four, which charges the Defendant with making false statements or representation. Thus, the Court does not entertain dismissal as to this count because Defendant only mentioned it in a perfunctory manner *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."); *Small Justice LLC v. Xcentric Ventures LLC*, 873 F.3d 313, 323 n.11 (1st Cir. 2017) (arguments developed for the first time in a reply brief are waived); *Butler v. Deutsche Bank Trust Co. Americas*, 748 F.3d 28, 36 (1st Cir. 2014) ("[W]e routinely deem waived arguments not timely presented before the district court.").

intended to further their illegal presence in the United States.[13] *U.S. v. Barajas-Montiel*, 185 F.3d 947, 954 (9th Cir. 1999). Section 1324(a)(1)(v), on the other hand, requires that the defendant engage in any conspiracy or aids or abets the commission of any of the preceding acts. Thus, the statements at issue would not affect the outcome of the trial or exculpate the Defendant. *Valenzuela-Bernal*, 458 U.S. at 868 (quoting *United States v. Agurs,* 427 U.S. 97, 104 (1976)). No statements from any of the occupants (except the Defendant himself) indicate that this endeavor was merely a family trip.

### IV.  CONCLUSION

For the foregoing reasons, it is recommended that Defendant's motion to dismiss be DENIED. This report and recommendation is filed pursuant to 28 U.S.C. 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court within fourteen days of its receipt. Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

IT IS SO RECOMMENDED.

In San Juan, Puerto Rico, this 27th day of June, 2025.

s/Marcos E. López
U.S. Magistrate Judge

---

[13] The elements of § 1324 (a)(1)(A)(i) are: "(1) knowing that a person is an alien; (2) bringing or attempting to bring; (3) an alien; (4) to the United States; (5) at a place other than a designated port of entry or other authorized place; and (6) regardless of whether the alien has received prior official authorization to come to, enter, or reside in the United States and regardless of any future action that may be taken with respect to the alien." *United States v. López*, 590 F.3d 1238, 1250 (11th Cir. 2009).